Argued and submitted March 21, affirmed April 30, 2014

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

JUAN CARLOS RUIZ-PIZA,
aka Juan Carlos Ruizpiza,
*Defendant-Respondent.*

Multnomah County Circuit Court
130130435; A155032

325 P3d 802

Susan G. Howe, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Neil F. Byl, Deputy Public Defender, argued the cause for respondent. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Armstrong, Presiding Judge, and Egan, Judge, and De Muniz, Senior Judge.

EGAN, J.

**EGAN, J.**

Defendant was indicted on five criminal counts for allegedly shaking his infant daughter. In this interlocutory appeal, the state assigns error to the trial court's pretrial order granting defendant's motion to suppress statements made during interviews with the police. The issue is whether, under ORS 136.425(1), Article I, section 12, of the Oregon Constitution, or the Fifth and Fourteenth Amendments to the United States Constitution, defendant made his statements voluntarily. Under the state statute, we affirm.

In reviewing the trial court's decision respecting the voluntariness of confessions and admissions, we accept the court's findings of fact if there is any evidence to support them. *State v. Goree*, 151 Or App 621, 631, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998). "If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, *e.g.*, voluntariness or lack thereof, made by the trial court * * *." *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Whether the facts found by the trial court are sufficient to sustain the trial court's ultimate conclusion regarding voluntariness is a question of law that we review for legal error. *Goree*, 151 Or App at 631.

Defendant and Pelayo, brought their infant daughter, G, to the hospital after she was injured. An attending physician did not believe that the observed injuries could have been caused in the manner that the parents claimed. Detectives Hurley and Manus of the Portland Police Bureau came to the hospital. The detectives were told by medical personnel that the child had sustained bruising, a subdural hematoma on the back of her head, and was displaying elevated liver enzymes, a symptom sometimes associated with trauma. The child was intubated and was not breathing on her own when the detectives arrived. Based on what they had been told, the detectives were concerned that the child had been abused.

The detectives interviewed both parents, beginning with Pelayo. Hurley testified that defendant approached them after that interview and indicated his desire to

discuss what had happened. That first interview took place in a hospital conference room with "exterior and interior" windows; the detectives were not wearing uniforms, wore badges clipped to their belts, and carried concealed firearms. Hurley testified that they informed defendant that he was not under arrest and told him that the interview was being recorded.[1] Defendant stated that he had been caring for G on the day in question and generally recounted what had happened on that day. He denied remembering any event that could account for G's injuries. At one point, detective Hurley stated:

> "I don't think you went home on Sunday and decided you were going to break your kid. That's not what I'm here saying. But sometimes something will happen that explains the injury that's an accident. There's no crime involved. I get to write my report that says, 'This was an accident. It wasn't meant to be but it explains the injury on the child.'"

After defendant replied that he couldn't remember anything that might have caused the injury, the detective continued:

> "[HURLEY]:   So let me tell you what type of injury this is. It's a head injury. It's a hematoma to the back of her head to her brain. Okay.
>
> "[DEFENDANT]:   Right. That's what she told me.
>
> "[HURLEY]:   Bleeding back there—so the doctor explained?
>
> "[DEFENDANT]:   Yeah. That's what [Pelayo] told me.
>
> "[HURLEY]:   Have you talked to the doctor, to Dr. Lanehart (ph)?
>
> "[DEFENDANT]:   No. I haven't. I got here around—around 2:30.
>
> "[HURLEY]:   Okay. So Dr. Lanehart is the doctor that has seen her and he is the one that's going to diagnose all her tests and do all that stuff. I've spoken to Dr. Lanehart. He is a specialist for child abuse. That's specifically what he's called in on and that's what he was called in on this case.

---

[1] Excerpts of the recordings were played at the hearing on the motion to suppress and appear in the trial court transcript. A transcript of the recordings was also entered into evidence; the quoted material in this opinion is taken from the latter source.

"[DEFENDANT]: Okay.

"[HURLEY]: The type of injury that she has to the back of her head is a shaking injury. So if you pick up a kid and you shake them really bad—

"[DEFENDANT]: Right.

"[HURLEY]: —then they get hematomas on the front and the back. They actually—it'll—it'll make them go blind. I mean it's a huge deal. Okay. If you pick up a baby and you shake them once because maybe they're crying or something has happened and you just kind of shake them once and their head pops back once, you can end up with a hematoma at the back of the head but it's not a shaking that causes lots of hematomas and serious brain damage."

After informing defendant further about the medical condition of G, Hurley told defendant that "[s]omeone shook her. She got shaken." Hurley continued:

"[HURLEY]: You shake a baby hard enough and you're going to damage the front, the back and actually they'll go blind because you hematoma their eyes. She doesn't have that, but somebody shook her. Okay? This isn't a question of telling you that the only way that this happened was that somebody shook her. She didn't hit her head on something because there would be a bruise on the back of her head—

"* * * * *

"[HURLEY]: —which there isn't. It's only internal damage. We have to figure out what happened as to who shook her. Okay? *If you tell me that you shook her on accident when you picked her up because you just picked her up too hard when you were playing with her, that's fine. Then that—then that's what happened and there's my story. But I need to know that because if I can't figure out what happened to her, then my assumption is going to have to be child abuse.* Okay. That's—because that's how it works. *We have to have an explanation.* Whether it be an accident explanation or 'I didn't like my kid today and I decided to hurt my child today.'"

(Emphasis added.) Defendant then stated that perhaps the injury had occurred when he picked G up too quickly after changing her. That first interview lasted approximately 45 minutes.

At the suppression hearing, Hurley testified that defendant reapproached the detectives and stated that he now remembered tossing G up in the air and suggested that perhaps this had caused the injury. The detectives commenced a second recorded interview, which began approximately one hour after the conclusion of the first and took place in the same hospital conference room. Defendant described playfully tossing his daughter up in the air and catching her; the recorded portion of that second interview lasted approximately 17 minutes.

On the next day, the detectives approached defendant at the hospital and asked him to come to another interview in a different hospital conference room. By that point, the detectives believed that defendant had caused the injuries to G. That third interview began with detective Manus describing certain medical details of those injuries:

"[MANUS]:  Were you able to hear about what the doctors told your family, what tests she's had today, anything like that?

"[DEFENDANT]:  Well, the only tests that we had is her eye test and her body [scan.]

"* * * * *

"[MANUS]:  Did you hear how that went or what the results were?

"[DEFENDANT]:  No. Just [Pelayo] text[ed] me, 'Oh, she just got done with this test, and she just got done with that test.' That's it.

"* * * * *

"[MANUS]:  *** Well, here's what we found out. So they did find some hemorrhaging behind [G's] left eye which also goes along with the bleed to the back of her head that just confirms how that happened to her. The fact that she's got the bleeding behind her left eye just shows that it was a very deliberate, quick, violent shake. It happened because she was shaken. They also did the body scan and most everything looks fine.

"[DEFENDANT]: No broken bones or anything?

"[MANUS]: Not that they're seeing yet. That doesn't mean that there aren't any broken bones and two weeks from now they could see some of the healing and then they can see, oh, there was some fractures in there that have healed and that's when they can tell. Okay. But right now, it looks okay. And obviously our main concern is [G] because doctors are trying to figure out kind of how to treat her, what's going on with her. Obviously, they know that she's had the brain trauma. She's had some elevated liver counts, let me get the right organ. And they're not really sure if that's related to the trauma that caused her brain injury or if there's something else going on. Okay.

"[DEFENDANT]: So regardless the infection supposedly the doctors told us at the beginning.

"[MANUS]: No. They don't—they don't believe so. That's kind of where some of the mystery is with the liver count. They have determined she doesn't have a urinary infection. They think that was probably a bad test done at Portland Adventist. So they have ruled that out. But they are, you know, kind of concerned because she still has a fever. She's still throwing up which is indicative of brain injury and then they've got these elevated liver counts. * * * [W]hatever happened to her to cause that brain bleed could explain the liver issue or we can find out how that happened and say, okay, the liver issue is separate. We need to look into that and treat it differently. Do you know what I'm saying?"

Manus also stated:

"And so somewhere in that time when she was fine * * * to Sunday evening something happened to her. And we need to know why for several reasons. Mainly, because the doctors want to give her the best possible care. Okay? You know, we're finding more results from these tests. In order for them to know exactly what happened, it can help determine * * * are there going to be other injuries that we need to look at. Like I said, is the liver issue something that's going to correlate to what happened to her for the brain?"

Defendant continued to deny having deliberately harmed G, and stated again that the injury must have happened when

he playfully threw the child up in the air. Manus repeatedly cast doubt on defendant's version of events. Detective Hurley then took over:

"[HURLEY]: This is a point in time in this case where you need to step up and tell me what happened to your daughter. I don't care about you right now or your wife right now. What I care about is your daughter. Your daughter has a significant brain injury that is bleeding in her head. She has significant trauma behind one of her eyes that she's lucky isn't going to cause blindness but may cause issues with her sight. She has a trauma to her liver that is causing high enzyme level in her body. If we knew exactly what happened to her to cause the head trauma, we can decide whether or not the liver enzymes are or are not, in fact, related to the head trauma. If they are not, * * * then they need to be treated differently than if they are related to the head trauma. Do you understand what I'm saying?

"[DEFENDANT]: Yes.

"[MANUS]: So the only way for us to know that is to know what happened to your daughter. I don't know what happened to your daughter. You know and [G] knows and [G] can't talk to me and she can't tell me. Okay.

"[DEFENDANT]: Yeah.

"[HURLEY]: But you are her father. Your job in your life, and I know you know this—

"[DEFENDANT]: Yeah.

"[HURLEY]: —is to protect your daughter.

"[DEFENDANT]: Okay.

"[HURLEY]: Your job is to make sure that she is happy and healthy and safe and that she knows her Lord as she is—as she is raised and you have done that. You've done a good job doing that. Okay. I also understand that you and [Pelayo] are concerned about having your child taken away from you. You're concerned about having your own welfare about what's going to happen if you tell me what you did that was a mistake at some point in time that happened on Sunday. I don't think you deliberately hurt your child. I

don't think you would. But I do think something happened that was an accident that caused this brain injury. * * *

"* * * *You were the only one that was with her. You were the only one that would know. She cannot do this to herself. She cannot crawl away and right now [G] needs you, she needs you to be stepping up as her father to tell me what happened so they can get her the medical care that she needs. This is not a minor injury. This isn't a boo-boo. And you are the only one at this point in time that can help her. I need you to do that and tell me what happened on Sunday.* You know what happened. I can see in your face that you know what happened. You just need to tell me—

"* * * * *

"[HURLEY]: I know you have a lot of things going through your head right now and a lot of concerns, but I really need you to step back from those and put [G] first. Okay. *I need you [to] tell me what happened to her so that I know what medical care she needs. If—if the head trauma doesn't have anything to do with the liver issues, then we need to know that. But I can't know that until I know how the head trauma happened. And if the liver is related to the head trauma then it may all work out on its own and it doesn't need extra medication or different care, but if the liver is— has got elevated counts because of something separate, some sort of disorder or infection, whatever, I need to know that.* * * * *Livers can get elevated based on a head trauma. They can depending on how the head trauma occurred. But I can't know that if I don't know how the head trauma occurred.*

"I am not here to tell you that you are a bad parent because you're not. I've actually already talked to the District Attorney about this case. Okay. I think you guys are good people.

"[DEFENDANT]: (Inaudible.)

"[HURLEY]: I really do. I like your in-laws, your mother-in-law is a really nice gal. She seems to really care about [G] and about helping you guys out to make sure that she's raised well and I think she did a good job. You step up and take care of your [other daughter] as well as taking care of your daughter here. You're a good dad. Okay. And I—I can't imagine being in your position. I can't. Because you—you know what happened and you need to tell me that but there's also this self-preservation part of not wanting to get yourself in trouble or causing more issues and

I understand that. I do. But again, and I—and I say this with all of my heart, you need to step up and be the father right now and protect your daughter. What happened?"

(Emphasis added.) Defendant continued to deny having any additional knowledge about what could have caused G's injuries; the detectives continued to insist that he did. After more questioning, the detectives eventually asked defendant to submit to a polygraph examination. After the detectives generally explained the procedures associated with that examination, defendant agreed to submit to one later that week. At the conclusion of that explanation, defendant asked, "So after all this are we—is this case going to court, or something?" Hurley replied, "No, not necessarily. Right now what's probably going to happen with this case is—so first [of] all let's—[.]" At that point, the detectives turned off the tape recorder.[2]

At the motion to suppress hearing, the state asked Hurley what happened after the recording ended. She explained that she told the defendant that the case "will go to the [district attorney] and make a determination [*sic*] of whether they think it's enough to charge somebody with a crime, but that wasn't a decision we could make at that time based on the information that we had." Hurley also stated that, she thought that she had asked defendant if he had any questions, explained that the investigation was not over, informed him of her belief that he knew what had happened to G, and told him to call her when he was willing to tell her what had happened. Hurley testified that the officers had packed up to leave and were headed for the door when defendant put his head down and said, "'I have something to say.'" He then told the detectives that he had shaken G because he was upset about the disorderly state of the house. That initial confession was not recorded; when defendant was finished confessing, the detectives pulled out the recording equipment and had defendant repeat his statements. There was a 25-minute gap between the end of the prior recording and the start of the one that captured defendant's confession.

---

[2] The trial court specifically referred to this moment in the interview as supporting its conclusion, noting that the officer "interrupted and it was over, and the next thing we have is a confession."

The trial court ordered defendant's statements suppressed.[3] At the conclusion of the hearing, the court identified several different statements of the officers that "jump out at me" and then stated:

> "Here was a man who had a baby in the hospital for shaken baby syndrome or some traumatic issue. Several times during the discussion with him he was asked to tell the truth because that would predicate what the treatment would be for the baby. Implicit in that is if he didn't, the baby was going to end up worse off.
>
> "I see that as compelling. I see the going back and forth by saying—minimizing to the defendant what's going to happen to him if he [comes] clean and he confesses. I believe that the statements, given these facts and circumstances, were involuntarily made, and that's based on the totality of circumstances. There's no one thing that jumps out at me but there are a lot of things that together tell me that his will was overborne by two detectives in that hospital room over two days."

This interlocutory appeal followed. *See* ORS 138.060(1)(c). The state's sole contention is that the trial court erred in concluding that defendant's statements to the detectives were made involuntarily.

Before analyzing the state or federal constitutional issues, we must begin with the standards for voluntariness under state law, specifically with ORS 136.425(1), which provides, "A confession or admission of a defendant * * * cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats." *See State v. Foster*, 303 Or 518, 526, 739 P2d 1032 (1987) (appellate courts consider statutory issues before state or federal constitutional issues). The state urges that the standards under the statute and Article I, section 12, of the Oregon Constitution do not differ in any respect that bears on this case; defendant does not argue otherwise. In the absence of arguments to the contrary, and consistently with our case

---

[3] The trial court did not specifically identify the statements that were subject to suppression. It seems apparent on the record, however, that the trial court referred to those statements constituting defendant's admission and any subsequent statements that were derived from that admission. We proceed under that assumption.

law on the issue, we proceed with that understanding. *See State v. Pollard*, 132 Or App 538, 888 P2d 1054, *rev den,* 321 Or 138 (1995); *Goree*, 151 Or App at 630, 630 n 1. "In Oregon, a confession is initially deemed involuntary. Before a confession can be received in evidence, the state must show that it was voluntarily given, that is, made without inducement through fear or promises, direct or implied." *State v. Mendacino*, 288 Or 231, 235, 603 P2d 1376 (1979) (internal citation omitted). "The test for voluntariness under Article I, section 12, of the Oregon Constitution is whether, under the totality of the circumstances, the waiver of rights and the confession were the product of an essentially free, unconstrained and informed choice or whether the accused's capacity for self-determination was critically impaired." *State v. Burks*, 107 Or App 588, 592, 813 P2d 1071, *rev den,* 312 Or 151 (1991). "[T]he key to the 'free and voluntary' character of the confession is the inducement made to the defendant— was there any promise or threat made to the defendant which would elicit a false confession[.]" *State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986); *see State v. Powell*, 352 Or 210, 218, 282 P3d 845 (2012) (stating that ORS 136.425 "encompasses the common law and thus applies to confessions induced by promises of leniency as well as by threats"). The state must prove voluntariness by a preponderance of the evidence. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991).

In a reflection of the two concerns identified by the trial court, the parties focus on two issues: the officers' assertions that the medical care received by defendant's daughter would suffer if he did not confess, and the notion that he was induced to confess by an implied promise of leniency. The state contends that the officers did not improperly threaten to withhold medical care from G, and that defendant could not have reasonably understood them to have done so; it also urges that there was no promise of immunity or leniency. Defendant does not maintain that the officers threatened to withhold medical care from G, but instead argues that the officers exploited his daughter's need for medical treatment as a means of pressuring him to confess. We stress that a conclusion favorable to state on either line of argument does not inexorably lead to the conclusion that the state has met

its burden of showing voluntariness; instead, and as the trial court properly recognized, the test considers the totality of the circumstances. *Goree*, 151 Or App at 631.

We begin with the issue of G's medical care; at the outset we state our agreement with the parties that the record cannot reasonably be read to reveal that the officers threatened to withhold medical care from G in the absence of a confession, and we do not perceive that the trial court so concluded. What the officers did do, however, was cultivate and leverage defendant's fear that, unless he admitted to shaking her, G's medical care would suffer. The state argues that accurately informing a defendant of the consequences of his refusal to cooperate is permissible, citing *State v. Hovater*, 42 Or App 13, 16, 599 P2d 1222 (1979) (advising a defendant of the "serious consequences" of a conviction, including being separated from his children, did not vitiate the voluntariness of his confession). That may be so, but what happened here was not merely pointing out the seriousness of G's situation or informing defendant of the natural consequences of withholding information about how G may have been injured. Instead, the officers informed defendant that the way to help his infant daughter was to tell them that *he had accidentally shaken her.* At the outset of the third interview, the officers learned—in response to their question on the subject—that defendant had not talked to the doctors about G's condition. The officers then explained that they had talked to the doctors; they emphasized the severity of G's injuries, including that she had "significant trauma," a "significant brain injury," "bleeding in her head," and may have vision problems; they then suggested—if not outright stated—that G's medical care would be dictated by what defendant told them. Having made clear that G had serious medical issues that could be ameliorated by a confession— an assertion that, as a matter of medical fact, is without any support in the record[4]—the officers also appealed to

---

[4] There was not, for instance, any suggestion that the doctors did not know the full extent of G's injuries; on the contrary, the officers repeatedly stated that they knew, from talking to the doctors, that G had been shaken, *viz.,* the cause of the injuries. We are aware that defendant might have, in circumstances more conducive to contemplation, realized that whether he confessed could not logically bear on the treatment his daughter received. Nonetheless, the trial court identified the fact that defendant told the officers that he was "stressing" as important

defendant's paternal responsibilities, his religion, stated that defendant was the *only* one who could help G, and stated, in effect, that the way to provide that help was to tell the officers that he had accidently shaken her.[5] Those statements, taken in the circumstances in which they were made, constituted an "inducement through * * * fear" that was specifically calculated to capitalize on what the trial court recognized as defendant's acute vulnerability. *State v. Benton*, 92 Or App 685, 689, 759 P2d 332 (1988).

Defendant urges that the conduct described above was sufficient on its own to render his subsequent confession involuntary. We need not decide whether that is the case however, because that was not the only form of inducement that the officers brought to bear on defendant.

On this point, the groundwork was laid early on by Hurley, when she stated that she did not believe that defendant meant to "break your kid," but that sometimes accidents happen and "[t]here's no crime involved. I get to write my report that says, 'This was an accident. It wasn't meant to be but it explains the injury on the child.'" Hurley later stated, *"We have to have an explanation.* Whether it be an accident explanation or 'I didn't like my kid today and I decided to hurt my child today.'" (Emphasis added.) Hurley also stated that, if defendant told her that he shook G "on accident," she would accept that answer ("then that's what happened and there's my story"); she also stated that, if defendant did not tell her that he shook G, the officers would assume that the child had been abused.

When Hurley stated "we have to have an explanation," a stark choice was put to defendant: either confess to accidentally shaking G and—in addition to securing better medical care—the officers would accept that version of events, or do not confess, and allow the officers to assume that the child had been abused. Whatever abstract legal

to its conclusion and suggested that officers had "exploited the vulnerability of the defendant."

[5] At various points, the officers told defendant: "someone shook her"; "you were the only one that would know"; "you are the only one that can help her"; "I need you [to] tell me what happened to her so that I know what medical care she needs."

distinction might exist between accidentally injuring a child while shaking the child and "child abuse" is of no moment; the obvious intent in drawing a distinction between the two alternatives was to induce defendant to confess to less-serious conduct than it would be assumed that he had committed in the absence of a confession. That the officers never explicitly made a promise of leniency or immunity is not dispositive; the effect of their approach was to tell defendant: "the only way to avoid having the police conclude that you are a child abuser is to tell us that you accidentally shook your daughter." *See Pollard,* 132 Or App at 544 ("'The precise form of words in which the inducement is presented to the prisoner's mind is immaterial. It is sufficient if they convey to him the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited.'" (Quoting *State v. Wintzingerode,* 9 Or 153, 163 (1881).)).

On a related note, the trial court specifically identified the moment when the third recording ended—that is, right after the officers told defendant that the case was not "necessarily" going to result in a criminal case—as central to its conclusion. *See* 262 Or App at 571, 571 n 2. Although the trial court did not make any explicit factual findings about what transpired in the 25-minute unrecorded interval between the end of the third recording and defendant's confession, we are required to assume that the trial court found the facts "in a manner consistent with the ultimate conclusion." *Ball,* 250 Or at 487.

Again, we do not decide whether either line of police conduct, standing alone, would represent an insurmountable obstacle to the state's effort to show that the statements were made voluntarily. When the inducements discussed above are taken in view of each other and the totality of the underlying circumstances of the interviews, we conclude that the trial court did not err in concluding that the statements were made involuntarily.

Affirmed.