STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RAMON RODRIGUEZ-MORENO,
*Defendant-Appellant.*

Washington County Circuit Court
C062342CR; A154612

359 P3d 532

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Susan Reid, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F.

Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

DEVORE, J.

## DEVORE, J.

Defendant was convicted of felony murder for the death of S, his girlfriend's young daughter. He assigns error to the trial court's denial of his motion to suppress evidence of his statements to police in his third and later interviews. He argues that those statements were involuntary under ORS 136.425(1), Article I, section 12, of the Oregon Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution. Defendant also assigns error to the trial court's imposition of court-appointed attorney fees without evidence in the record supporting defendant's ability to pay. We conclude that the trial court did not err in denying defendant's motion to suppress, but we reverse the award of attorney fees.

"In reviewing the trial court's decision respecting the voluntariness of confessions and admissions, we accept the court's findings of fact if there is any evidence to support them." *State v. Ruiz-Piza*, 262 Or App 563, 564, 325 P3d 802 (2014). In this case, the court did make findings. "If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, *e.g.*, voluntariness or lack thereof, made by the trial court ***." *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). "Whether the facts found by the trial court are sufficient to sustain the trial court's ultimate conclusion regarding voluntariness is a question of law that we review for legal error." *Ruiz-Piza*, 262 Or App at 564 (citing *State v. Goree*, 151 Or App 621, 631, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998)).

The parties do not dispute the material facts, and defendant does not dispute evidence from the first two police interviews. Defendant, his girlfriend Onofre-Nava, and her daughter S arrived at a hospital at 2:40 p.m., on August 1, 2006. S, then 19 months old, did not have a pulse and was not breathing. A medical team temporarily restored a pulse but concluded that S was "essentially brain dead." Before transferring S to another hospital, a doctor told defendant and Onofre-Nava that he did not believe there would be a "good outcome."

At around 4:00 p.m., Detectives Brady and Matrisciano arrived at a subsequent hospital, where S had been transferred, to investigate what its medical staff believed could be "non-accidental trauma" to S's head. Defendant and Onofre-Nava were in a hospital waiting room. The trial court found that, at the time, the police, having very little information, had not formed an opinion about whether a crime had been committed or who might be responsible for S's injuries.

The detectives interviewed Onofre-Nava for about two hours, while defendant waited elsewhere. Defendant consented to speak with Brady and an officer who served as an interpreter. Before beginning his first interview, defendant was advised that he was free to leave and did not "have to say anything." The interview lasted for one hour and 10 minutes, from about 8:20 p.m. to 9:30 p.m., but it did not reveal any inculpatory evidence. Defendant told Brady that he had dropped off Onofre-Nava at work in the morning and was S's caretaker for the day. Defendant was not S's usual caretaker. He said that S had eaten some of his food with chili sauce, which burned her mouth. He said that she had cried a lot and eventually fell asleep on the couch. He said that, later in the afternoon, S had fallen backwards on the bare floor, cried, and vomited. After the first interview, defendant agreed to wait in case the police had more questions.

Around 10:00 p.m., Matrisciano and Brady exchanged information. Matrisciano had learned from medical staff that S had a skull fracture, subdural hematoma, and retinal hemorrhaging—a fatal combination of conditions that doctors "believed was more likely * * * non-accidental trauma, blunt force trauma or shaken baby sort of case."

Shortly after midnight, defendant gave Brady a second interview. Defendant was advised of his *Miranda* rights in Spanish.[1] The trial court found that

"defendant was advised of the following rights:

"a.   The right to remain silent,

---

[1] On appeal, defendant does not argue that he did not understand the *Miranda* warnings or contend that his statements were involuntary as a result of improper translation.

"b.	That anything the defendant said could be used against the defendant in court,

"c.	The right to counsel prior to and during questioning,

"d.	The right to court appointed counsel if the defendant is indigent, and

"e.	The right to decide at any time to not answer any questions or make any statements."

The second interview lasted about two hours and 45 minutes, ending at 2:45 a.m.

In the second interview, defendant provided an account like before, but he added that he had twice left S sleeping alone in the apartment for 15 minutes. Brady told defendant that he did not believe that defendant had provided a complete story of what had happened. Eventually, defendant said that he would tell the truth if Onofre-Nava could sit next to him. Onofre-Nava came into the room, and the second interview continued with some variations to the sequence of events and some changes in details. Defendant added that, at about 1:00 p.m., he woke S up to go to Onofre-Nava's workplace and that S was unsteady on her feet and vomited. Defendant recounted that, as he carried S to the car, she squirmed, slipped out of his arms, and fell headfirst onto the cement in the parking lot.

The detectives asked Onofre-Nava to leave the consultation room, and they questioned defendant alone for 30 minutes. They did not believe defendant's account; they believed that "there is something more that happened" than "just a simple fall[.]" During the second interview, the detectives became more confrontational and "began to call into doubt [defendant's account]." The trial court found that, "[a]t one point during the interview, Detective Brady raised his voice, but Detective Brady was not yelling or threatening the defendant."

A third interview began about 3:00 a.m., this time conducted by Matrisciano. The trial court found that the detective began by asking if defendant recalled the *Miranda* warnings. When Matrisciano began repeating them, defendant interrupted to say that he understood the warnings

and would speak to the detective. The third interview lasted for one hour and 15 minutes.

Matrisciano insisted that "there was something else that had happened." At some point, Matrisciano told defendant "that it was important that [he] know what happened so that the doctors could be able to treat [S]."[2] The trial court found that Matrisciano's statement was untrue and that the detective knew the child was brain dead and would not recover.

Defendant broke eye contact and sat quietly. He told Matrisciano that he was scared that Onofre-Nava would leave him. Matrisciano asked how many times defendant had shaken S. Defendant admitted that he shook S one time after she had gotten into his food and started crying. At Matrisciano's request, he demonstrated how he shook S forcefully by the arms. Matrisciano noticed that defendant demonstrated that he had shaken the imaginary S three times and that he demonstrated her head moving all the way backward and forward each time. Defendant admitted that he was angry and that, on a scale of one to 10, from low to high, he had been "a seven." After shaking S, defendant said, he laid S down forcefully on the couch. Defendant agreed to make a tape-recorded statement, and he repeated what he had just told Matrisciano.[3] At the end of the third interview, defendant was arrested and told that S would likely die from her injuries.

While defendant was in jail, Brady conducted a fourth interview, at about 9:00 p.m. on August 2. Brady repeated the *Miranda* warnings, and defendant allowed that he had "big trouble with anger." Defendant agreed to do a "walk-though" to demonstrate what had happened. Matrisciano and Brady took defendant back to the apartment at about 10:15 p.m. to make a video-recorded reenactment. Defendant admitted to shaking S while he was angry and putting her on the couch. He repeated that S had fallen

---

[2] Matrisciano later testified at the pretrial hearing that he "may have rephrased it slightly a second time."

[3] During the tape-recorded statement, defendant used the descriptions, "brutal or brutally," and "like crazy," when referring to the way he put S onto the couch.

out of his arms onto her head in the parking lot. At the end of the reenactment, Matrisciano told defendant that S had died.[4] Defendant was charged with felony murder.[5]

Defendant moved to suppress all his statements made after Matrisciano "falsely told him that they needed information from him *** in order to be able to assist the doctors in saving [S's] life." Defendant argued that the statement contributed to coercive circumstances in violation of defendant's rights under Article I, section 12, and under the Fifth and Fourteenth Amendments.[6]

The trial court denied the motion, determining, among other things, that "defendant was never given any promises or threatened in any way"; "[t]here was no evidence that defendant suffered from any mental impairment at any time"; "defendant was never denied any request he made to use the restroom or for water"; the conversations with officers "were civil and polite"; Matrisciano's misstatement did

---

[4] Physicians eventually determined that S's injuries resulted from "inflicted head trauma." An expert testified at defendant's trial that S suffered "a high energy impact" equivalent to "a blow of *** a hammer or a bat to the back of the head *** [similar to] a car accident where the passenger is unrestrained and thrown out of the car and hitting pavement *** [or] someone falling out of a third to fourth story window and landing on top of their head."

[5] As relevant to these circumstances, ORS 163.115(1)(c)(B) provides that felony murder is committed when a person causes a death by neglect or maltreatment.

[6] Defendant did not raise ORS 136.425(1), relating to confessions, in his motion to suppress. Under Oregon's "first things first" doctrine, we have an obligation to address statutory grounds before constitutional grounds and to address state constitutional grounds before federal ones. *See State v. Kennedy*, 295 Or 260, 266-67, 666 P2d 1316 (1983) ("[A]n Oregon court should not readily let parties, simply by their choice of issues, force the court into a position to decide that the state's government has fallen below a nationwide constitutional standard, when in fact the state's law, when properly invoked, meets or exceeds that standard."). On the other hand, the doctrine of "preservation of error," expressed in ORAP 5.45, discourages our review of an argument that has not been raised below. *See State v. Tryon*, 242 Or App 51, 53 n 1, 255 P3d 498 (2011) (deciding confrontation clause claim under Sixth Amendment without addressing unpreserved state constitutional claim).

Determining which doctrine has priority should await a situation in which the answer matters. It does not matter here. Our case law reflects that ORS 136.425(1) and Article I, section 12, "do not differ in any respect that bears on" the issue of voluntariness. *Ruiz-Piza*, 262 Or App at 572-73. A decision whether to address the unpreserved statutory issue is irrelevant to the outcome. *See State v. Velykoretskykh*, 268 Or App 706, 707 n 2, 343 P3d 272 (2015) (proceeding to federal constitutional grounds rather than unpreserved state grounds).

not render defendant's statements involuntary; and, under the totality of the circumstances, the state had met its burden to prove that defendant's statements "were freely and voluntarily given."

The case proceeded to trial. Defendant testified that, at the time of the incident, he had been in a relationship with Onofre-Nava for about two and one-half months and had moved into their apartment sometime in June. Defendant testified that he loved S "as if she was a daughter." He further testified that he shook S one time because she would not stop crying, that he did not shake her hard, that when he put S on the couch she must have hit her head on the armrest, and that he did not realize she was badly hurt until 1:30 p.m., which was about an hour before he took S to her mother's workplace, then the hospital.

On appeal, we begin with defendant's first assignment of error. We determine whether defendant's statements were voluntary for the purposes of Article I, section 12, the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment. The standards are familiar. "The test for voluntariness under both the state and federal constitutions is whether, under the totality of the circumstances, it is apparent that 'the defendant's will was not overborne and his capacity for self-determination was not critically impaired.'" *State v. Acremant*, 338 Or 302, 324, 108 P3d 1139, *cert den*, 546 US 864 (2005) (quoting *State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989)); *see also Schneckloth v. Bustamonte*, 412 US 218, 225-26, 93 S Ct 2041, 36 L Ed 2d 854 (1973).[7]

"In Oregon, a confession is initially deemed involuntary. Before a confession can be received in evidence, the state must show that it was voluntarily given, that is, made without inducement through fear or promises, direct or implied." *State v. Mendacino*, 288 Or 231, 235, 603 P2d

---

[7] This court has observed that, like the federal analysis, "[t]he amount of pressure that police constitutionally may exert will vary with the 'totality of circumstances' surrounding a statement; the factors to be considered as part of that totality include a suspect's age, education, and intelligence." *State ex rel Juv. Dept. v. Deford*, 177 Or App 555, 572, 34 P3d 673 (2001).

1376 (1980) (internal citation omitted).[8] Our inquiry focuses on whether police or a government agent made any promise or threat, which would elicit a false confession. *Ruiz-Piza*, 262 Or App at 573 (citing *State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986)). "Voluntariness is determined without regard to the truth or falsity of the confession." *Goree*, 151 Or App at 631. The state must meet its burden to prove voluntariness by a preponderance of the evidence. *Ruiz-Piza*, 262 Or App at 573 (citing *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991)).

As this court has observed, "[t]hreats, promises, inducements, and similar overreaching by the police have consistently led to suppression of a defendant's resulting statements and confessions; by contrast, in the absence of police overreaching, challenges to the voluntariness of a defendant's statements or confessions have consistently failed." *State v. Tanner*, 236 Or App 423, 431, 236 P3d 775 (2010). The Supreme Court has concluded that, where the police were civil and friendly and did not engage in deceptive tactics, and where the defendant understood that he was a prime suspect in the case, the defendant's confession following *Miranda* warnings was voluntary. *State v. Terry*, 333 Or 163, 171-72, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002).

On appeal, defendant repeats his argument that circumstances rendered his statements involuntary.[9] He stresses that he "had been kept secluded in a small, windowless consultation room for over seven hours" without sleep, that he did not know S's true medical condition, and that police kept him separated from Onofre-Nava.

Defendant primarily relies on our decision in *Ruiz-Piza*, arguing that his confession was involuntary because Matrisciano cultivated and leveraged fear that, without his

---

[8] In part, Article I, section 12, provides, "No person shall be * * * compelled in any criminal prosecution to testify against himself."

[9] We understand defendant's argument to be that his confession should have been suppressed, because, if it was not the result of improper inducement, it was the result of additional coercive police tactics that occurred after defendant received *Miranda* warnings. *See Tanner*, 236 Or App at 431 ("Voluntariness requires that neither duress nor intimidation, hope nor inducement caused the defendant to confess.").

admission, S's medical care would suffer. *See* 262 Or App at 574 (where police exploited a father's relationship). The state responds that, although *Ruiz-Piza* has some similarities to the case at hand, it is distinguishable. The state further contends that the police behaved professionally throughout the interviews, did not threaten defendant, did not exploit his religion, did not promise him leniency, and "were meticulous in administering and reminding defendant of his *Miranda* rights." We agree.

Defendant's authority is indeed a close parallel. In *Ruiz-Piza*, we considered the state's interlocutory appeal, challenging the trial court's pretrial order suppressing the defendant's statements that he made to police. The defendant had brought his infant daughter, G, to the hospital with bruising, a subdural hematoma on the back of her head, and elevated liver enzymes—a symptom that can be associated with physical trauma. *Id.* at 564. The investigating detectives interviewed the defendant, confirmed that he had been G's caretaker the day she was injured, and confronted him with the findings of the physicians that G had head injuries consistent with abuse. A detective repeatedly told the defendant that someone had shaken G and that it was necessary to determine what had happened to her. The defendant denied intentionally harming G and suggested that the injury occurred "when he playfully threw the child up in the air." *Id.* at 568-69.

Over the course of two days, the detectives interviewed the defendant three times. During the third interview, the detectives repeatedly emphasized that G had suffered brain trauma and that the attending physicians needed to know whether her elevated liver enzymes were related to her head injury so that they could effectively treat her condition. *Id.* at 569-70. The detectives repeatedly appealed to the defendant's role and responsibility as G's father, telling him, for example, that it was his job "to protect [his] daughter." *Id.* at 571. At some point, they attempted to appeal to his religion. The detectives pressed the defendant to confess that he had accidentally shaken G, or else cautioned that they would assume that G had been abused. *Id.* at 575. The detectives' remarks implied the prospect of leniency in bringing charges. Despite the defendant's continued denials

of wrongdoing, the detectives persisted in their questioning and asked if he would submit to a polygraph test. *Id.* at 571. The defendant eventually made the inculpatory admissions at issue in his motion to suppress.

On appeal, we affirmed the trial court's suppression of the defendant's statements. We observed that the officers "cultivate[d] and leverage[d] defendant's fear that, unless he admitted to shaking her, G's medical care would suffer." *Id.* at 574. We observed that the detectives

> "suggested—if not outright stated—that G's medical care would be dictated by what defendant told them. Having made clear that G had serious medical issues that could be ameliorated by a confession—an assertion that, as a matter of medical fact, is without any support in the record—the officers also appealed to defendant's paternal responsibilities, his religion, stated that defendant was the *only* one who could help G, and stated, in effect, that the way to provide that help was to tell the officers that he had accidentally shaken her. Those statements, taken in the circumstances in which they were made, constituted an 'inducement through * * * fear' that was specifically calculated to capitalize on what the trial court recognized as defendant's acute vulnerability."

*Id.* at 574-75 (emphasis in original) (quoting *State v. Benton*, 92 Or App 685, 689, 759 P2d 332 (1988)).

In *Ruiz-Piza*, we expressly declined to decide whether the police conduct sufficed to render the defendant's confession involuntary when either appealing to the defendant's parental responsibility or falsely indicating that the child's medical care depended on the defendant's answers. *Id.* at 575-76. We noted that "we do not decide whether either line of police conduct, standing alone, would represent an insurmountable obstacle to the state's effort to show that the statements were made voluntarily." *Id.* at 576. Those facts did not constitute "the only form of inducement that the officers brought to bear on defendant." *Id.* at 575.

The final fact was the implication of leniency. Although police had not promised any immunity, they had said, in the beginning, that sometimes accidents happen and "[t]here's no crime involved." *Id.* at 565. If the defendant

would admit that he shook the child "on accident," then they would accept that answer. Detectives had given the defendant the choice to either confess to accidentally shaking G or to allow them to assume that the child had been intentionally abused. We observed that "the obvious intent in drawing a distinction between the two alternatives was to induce defendant to confess to less-serious conduct than it would be assumed that he had committed in the absence of a confession." *Id.* at 576. As did the trial court, we noted as significant that, just before a 25-minute gap between the end of the recording and the defendant's confession, the police had told the defendant that the case was not "necessarily" going to result in criminal charges. *Id.*

We distinguish the circumstances in this case from those in *Ruiz-Piza* in four ways.

First, unlike *Ruiz-Piza*, the detectives interviewing defendant did not *repeatedly* state or suggest that S's treatment would suffer in the absence of defendant's confession. Matrisciano stated once, or apparently a second time with rephrasing, that "it was important that [he] know what happened so that the doctors could be able to treat [S]." Unlike statements in *Ruiz-Piza*, Matrisciano's statement did not imply that defendant was the *only* source of hope for S.

Second, the detectives did not appeal to defendant's "acute vulnerability" in the same way, nor to the same extent, as the detectives did in *Ruiz-Piza*. *See* 262 Or App at 574-75 (where uncertainty of medical diagnosis was stressed). Defendant was not S's father, and he had only been involved in S's life for about two months while he dated Onofre-Nava. He was not the normal, daily caregiver. The detectives did not make an appeal to defendant's religious convictions. And, defendant was not impaired developmentally or under the influence of drugs or alcohol. Instead, detectives worked on defendant's sense of empathy or guilt—presumably, common human emotions in the circumstance of unintended, grave, human injury.

Third, apparently unlike *Ruiz-Piza*, detectives provided defendant with *Miranda* warnings, and they refreshed defendant's recollection of the warnings prior to the third

interview. They repeatedly reminded defendant that he did not need to say anything, that whatever he did say would be used against him in court, and that he could have a lawyer assist him.

Fourth, the detectives did not induce defendant to confess by presenting an illusory choice between different degrees of criminal offenses, such as a "choice" to confess to less-serious conduct or to face the assumption that he had intentionally committed child abuse. There was no implication of leniency.

In this case, the record supports the trial court's findings that "defendant was never given any promises or threatened in any way." Although defendant remained at length in the hospital, his stay was voluntary. As the trial court found, "defendant was never denied any request he made to use the restroom or for water," and the conversations with officers "were civil and polite." Defendant was reminded of his rights, and he chose to continue speaking with the investigating detectives. He understood that he was the primary suspect in causing S's injuries. His will was not overborne, and his capacity for self-determination was not critically impaired. His candid statements were not the result of any threats or promises. We conclude that the trial court did not err in determining that, in the totality of these circumstances, defendant's statements were voluntary. *See Acremant*, 338 Or at 324 (concluding that the facts were "insufficient to provide the basis for the conclusion that defendant's statements were involuntary").

Defendant's second assignment of error can be addressed briefly. Defendant argues that the trial court erred in ordering him to pay $2,000 in attorney fees without evidence in the record that he had the ability to pay. Defendant acknowledges that his assignment of error is unpreserved and asks that we exercise our discretion to review for plain error. The state concedes that the error is plain and contends that we should reverse the award of attorney fees without remanding for resentencing. We agree and accept the state's concession that the trial court erred, and, for the reasons stated in *State v. Coverstone*, 260 Or

App 714, 716-17, 320 P3d 670 (2014), we exercise our discretion to correct the error, and reverse the award of attorney fees.

Portion of judgment requiring defendant to pay attorney fees reversed; otherwise affirmed.