Submitted September 19, 2019, resubmitted en banc September 21, 2020; reversed and remanded September 29, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID LEROY CENTER, JR.,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR54262; A166777

499 P3d 63

Defendant appeals a judgment convicting him of attempting to elude a police officer, ORS 811.540(1)(b)(B). Defendant contends that the trial court erred in denying his motions to suppress (1) his confession to being the driver of the pursued vehicle, and (2) an eyewitness's identification of defendant as the driver. The court did not reach the merits of the identification issue, as any error was harmless under the circumstances. Regarding the confession, defendant argues that, under ORS 136.425(1), the state did not meet its burden of proving that the confession was voluntary, because it was the product of a police officer's explicit threat of jail and the loss of defendant's car. The state concedes that the officer's threats prompted defendant's confession, but argues that the threats were not unlawfully coercive, because the officer had lawful authority to carry out the threatened actions. *Held*: Under ORS 136.425(1), the voluntariness of a confession depends on whether a person's confession is the unlawful product of threats, not whether the threatened actions themselves are lawful or unlawful. Accordingly, the trial court erred by denying defendant's motion to suppress his confession. To the extent that the trial court erred in denying defendant's motion to suppress eyewitness-identification evidence, any such error was harmless under the specific circumstances of defendant's trial, but defendant was given leave to raise the issue again upon any retrial.

Reversed and remanded.


En Banc

Stephen K. Bushong, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Morgen E. Daniels, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Tookey, DeHoog, Shorr, James, Aoyagi, Powers, Mooney, and Kamins, Judges.

DeHOOG, J.

Reversed and remanded.

DeHoog, J., filed the opinion of the court in which Armstrong, Ortega, Tookey, Shorr, James, Aoyagi, Powers, and Kamins, JJ., joined.

Mooney, J., dissented and filed an opinion in which Egan, C. J., and DeVore, J., joined.

Lagesen, J., took no part in this decision.

**DeHOOG, J.**

Defendant appeals a judgment convicting him of attempting to elude a police officer, ORS 811.540(1)(b)(B). In three assignments of error, defendant contends that the trial court erred in denying his motions to suppress (1) his confession to being the driver of the pursued vehicle; (2) an eyewitness's out-of-court identification of defendant as the driver of the pursued vehicle; and (3) the same witness's in-court identification of defendant. We do not address the merits of defendant's second and third assignments of error relating to defendant's identification as the driver.[1] However, we conclude that the trial court erred in denying defendant's motion to suppress his confession and that the error was harmful. Accordingly, we reverse and remand.

The material facts, most of which are taken from the suppression hearing, are undisputed for purposes of appeal. On the evening of July 27, 2017, Trooper Schmidt of the Oregon State Police (OSP) was on duty and conducting traffic patrol in the area of 82nd Avenue in Portland. At approximately 10:50 p.m., as Schmidt was concluding an unrelated traffic stop, he saw a white Honda hatchback drive by at a "visually high rate." Schmidt immediately followed the Honda and, after unsuccessfully attempting to stop it, he found the car in a parking lot located behind a business and adjoining an apartment complex. Two occupants were seated in the Honda, but neither was in the driver's seat. Riviere, who lived in one of the nearby apartment units, approached Schmidt and gave him a description of another person who, according to Riviere, had walked away from the car and approached his apartment. Schmidt later showed Riviere a DMV photograph of defendant, who was

---

[1] The trial court concluded that the evidence of defendant's identity was the product of "highly suggestive procedures used by the police." *See State v. Lawson/James*, 352 Or 724, 749-63, 291 P3d 673 (2012) (establishing methodology for deciding admissibility of eyewitness-identification testimony under OEC 602, OEC 701, and OEC 403). However, reasoning that perhaps an appropriate jury instruction would alleviate any unfair prejudice, the court concluded that the evidence was not "so unreliable that it must be excluded." In light of defendant's subsequent jury waiver and the particular circumstances of the ensuing bench trial, we conclude that any error in the admission of that evidence was harmless; we therefore do not reach the merits of defendant's second and third assignments of error. On any retrial, however, defendant is free to renew his argument under *Lawson/James*.

the registered owner of the Honda, and Riviere told him that he was 80 to 85 percent certain that the person he had seen was the person in the photo. Based on Riviere's identification and defendant's status as the registered owner of the Honda, Schmidt believed that he had "enough information for an arrest."

The following afternoon, defendant went to the OSP office in Milwaukie in an effort to retrieve the Honda, which had been towed there as evidence of a crime. At Schmidt's request, defendant agreed to a tape-recorded interview.[2] After being advised of his *Miranda* rights, defendant denied that he had driven the Honda the night before, when the suspected attempt to elude had taken place, and said that he had been at a party from about 10:00 p.m. until 3:30 a.m. Schmidt, who did not believe defendant's denial, recontacted Riviere, who had been sent newer photographs taken of defendant upon his arrival at the OSP office. Based on the new photographs, Riviere told Schmidt that he now was 100 percent certain that defendant had been the driver.[3] At that point, Schmidt believed that he had probable cause to arrest defendant for reckless driving, reckless endangerment, and attempting to elude a police officer.

On the recording, defendant can be heard telling Schmidt that he was at a party the night before, when a "buddy" had asked to borrow his car. Defendant expresses difficulty remembering the details of the party, including whom he was with or who else was there. Defendant tells Schmidt that he did not leave the party until early morning, when he walked home, in part because his buddy "Junior" never returned with his car. Defendant says that he learned only third hand that his car had been impounded the night before. Schmidt, having by this time in the interview recontacted Riviere, tells defendant that he does not believe him, in part because he has an eyewitness who has positively identified defendant as the driver based on the photographs

_____

[2] Schmidt first testified regarding his investigation, including his interview of defendant, after which the state played the recorded interview.

[3] Because they are relevant only to defendant's challenges to Riviere's in-court and out-of-court statements identifying defendant, which we do not address, we omit any further descriptions of Riviere's account of events or the manner in which Schmidt obtained Riviere's eyewitness statement.

taken earlier that afternoon. Initially undeterred, defendant maintains his denial at that point.

At the suppression hearing, Schmidt testified that, despite his certainty that defendant was lying, he had not threatened defendant to get him to tell the truth—that he had not "h[e]ld a gun to his head." Schmidt did, however, give defendant an ultimatum based on whether "he wanted to tell [Schmidt] what really happened," meaning, in Schmidt's view, that defendant had been the driver of the Honda. The recorded interview includes the following exchange:

"[SCHMIDT:] So this can go *a couple of different ways*, okay? I have somebody that puts you at that scene when that event happened last night, okay?

"[DEFENDANT:] Did they?

"[SCHMIDT:] Yeah. Okay. Like we just discussed, it's a very populated area, okay? So I have somebody that put you in that car last night, okay?

"[DEFENDANT:] Mm-hmm.

"[SCHMIDT:] So we can *either level*—you *can level with me* and just kinda tell me what happened, if you freaked out, got nervous, got scared about going back to jail or prison or something like that—

"[DEFENDANT:] Yeah.

"[SCHMIDT:] —give me *a plausible explanation*, and I can work with you, okay? *If we still keep going down this road* of 'this didn't happen, this wasn't me, it was somebody that I don't know'—

"[DEFENDANT:] Yeah.

"[SCHMIDT:] —*then you can maybe spend the week-end in jail* and talk to the judge on Monday about it, okay? 'Cause that's kinda where I'm at right now with this."

(Emphases added.) Still, defendant did not immediately acknowledge his guilt. He told Schmidt that he was "just a little scared," adding, "I don't even want—I have to do this, you know[?]" Schmidt turned his focus to defendant's car:

"[SCHMIDT:] Well, I don't want you—I don't want you to lose your car, okay?

"[DEFENDANT:]   Yeah.

"[SCHMIDT:]   Believe—I'm being real with you. When—when I'm being honest, [you want] your vehicle back?

"[DEFENDANT:]   Yeah.

"[SCHMIDT:]   So when I saw that car, I know what that car means to you.

"[DEFENDANT:]   Yeah.

"[SCHMIDT:]   I saw how you took care of it.

"[DEFENDANT:]   Yeah.

"* * * * *

"[SCHMIDT:]   It's your baby, right?

"[DEFENDANT:]   Yeah. It's everything I have.

"* * * * *

"[SCHMIDT:]   We can talk about what we need to talk about, resolve what we need to talk about today and then figure out a way to get your car out so it doesn't get lost and a lien placed on it where you can't get it out. Okay?"

Finally, after again saying, "I'm just scared," defendant chose to avoid going to jail and potentially losing his car and admitted that he had been the suspect driver the night before.

    At the conclusion of the suppression hearing, defendant argued that his statements had been involuntary. He noted that he had maintained his innocence for 20-25 minutes, that Schmidt had engaged in a "two, two-and-a-half minute speech" about the need for defendant to "tell him the truth," and that Schmidt's express or implied promises of leniency regarding jail and the recovery of his prized vehicle rendered his confession involuntary as a matter of law. Defendant alternatively characterized Schmidt's promises of leniency as "corresponding * * * threats if he did not confess * * * 'you're gonna go to jail and your car might get a lien on it.'" The state did not dispute that Schmidt's statements had prompted defendant's confession. However, citing *State v. Landers*, 101 Or App 293, 790 P2d 1161, *rev den*, 310 Or 205 (1990), the state argued that, because Schmidt had

probable cause to arrest defendant and therefore could lawfully have carried out his threat of jail, defendant's statement was not the product of unlawful inducement.

In the course of the parties' arguments, the trial court expressed uncertainty whether the statements that Schmidt had made were the sort of promises of leniency that could render defendant's statement involuntary. The court observed that, in its view, a promise of leniency is typically a promise in regard to the crime being investigated. The court noted that Schmidt had made no promises of leniency as to the offenses he was investigating; rather, "[i]t was more, 'we're just not gonna take you into custody right now.'" That, at a minimum, the court reasoned, indicated that defendant's statements were not unlawfully induced *as a matter of law.*

Ultimately, the trial court orally ruled that Schmidt had not unlawfully induced defendant's confession. The court found that Schmidt had given defendant the option of (A) telling him the truth, thereby avoiding jail and gaining Schmidt's help with recovering his vehicle, or (B) maintaining his story, which would result in his arrest and at least a couple of days in jail. Faced with those options, the court found, defendant had confessed to having been the driver the night before. The court reasoned that, because Schmidt had probable cause to arrest defendant and take him into custody, giving defendant that ultimatum was not, in light of *Landers*, sufficient to render defendant's statement involuntary as a matter of law.

The trial court then proceeded to consider whether, in light of Schmidt's additional comments regarding defendant's car, the totality of the circumstances rendered his confession involuntary. After finding that Schmidt's statements about the car were truthful and that "all he [had] said was that he would work with him and help him get [the] vehicle back if he could do that," the court concluded that Schmidt's playing on defendant's "emotional attachment to his car" had not been a threat or a promise of leniency.

In light of those findings and conclusions, the trial court denied defendant's motion to suppress his confession. Following the further denial of his motions to exclude evidence

of Reviere's identifications of him as the driver, defendant waived jury and the trial court found him guilty of attempting to elude a police officer. Defendant now appeals.

Defendant's first assignment of error challenges the trial court's determination that his confession was voluntary under ORS 136.425(1) and Article I, section 12, of the Oregon Constitution. On appeal, defendant reprises the arguments that he made to the trial court, emphasizing that the state bears the burden of proving that his confession was voluntary. In his view, the state cannot satisfy that burden in light of Schmidt's explicit threat of jail and his clear implication that whether defendant would recover his car would depend, at least in part, on whether defendant told Schmidt what he wanted to hear—that defendant had, in fact, been the driver of the fleeing car. In response, the state expressly agrees with defendant's assertion that Schmidt threatened "to jail defendant if he did not cooperate and confess his involvement"; the state argues, however, that Schmidt's threat was not unlawfully coercive, because he had probable cause to arrest defendant and therefore was merely threatening to do something that he had the lawful authority do. As for Schmidt's statements about defendant's car, the state contends that, under the totality of the circumstances, they cannot be viewed as coercive, because, among other things, defendant's cousin was present with him at the OSP office and available to recover defendant's car even if he could not. We turn to those arguments.

We first consider whether the trial court's admission of defendant's confession violated ORS 136.425(1). *See State v. Foster*, 303 Or 518, 526, 739 P2d 1032 (1987) (stating the court's preference for deciding cases on subconstitutional grounds when feasible). As noted, the facts material to that assessment are not in dispute. Accordingly, we focus on the trial court's conclusion that defendant's statements were voluntary, which we review for legal error. *See State v. Belle*, 281 Or App 208, 210, 383 P3d 327 (2016).

We begin by reviewing the applicable law. Although, as noted, our initial focus is on ORS 136.425(1), we adhere to our practice of discussing that statute together with Article I, section 12, of the Oregon Constitution, because

the analysis under the two provisions is substantially the same. Article I, section 12, provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." Similarly, ORS 136.425(1) excludes evidence of confessions and admissions "made under the influence of fear produced by threats."[4] *See State v. Mendacino*, 288 Or 231, 235, 603 P2d 1376 (1979). Notwithstanding the statute's express reference only to threats, not promises, both ORS 136.425(1) and Article I, section 12, "embody the common-law rule that confessions made by a defendant in custody that were induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge, are inadmissible against the defendant." *State v. Jackson*, 364 Or 1, 21, 430 P3d 1067 (2018) (internal quotation marks omitted). Further, to ensure all defendants the protections of Article I, section 12, and ORS 136.425(1), out-of-court confessions are presumed involuntary, with the state bearing the burden of proving voluntariness. *Id*.

Impermissible inducements include promises of lenient treatment. It is true, as the trial court evidently recognized, that appellate decisions discussing promises of leniency often involve an express or implied promise that a suspect will receive a less severe penalty if he or she confesses. *See, e.g.*, *State v. Hogeland*, 285 Or App 108, 117, 395 P3d 960 (2017) (officer's statements regarding treatment could be viewed as unlawful inducement whether "viewed as a promise of a less severe outcome or as a promise of no punishment whatsoever"). Moreover, the leading common-law decision on unlawful inducements, *State v. Wintzingerode*, 9 Or 153 (1881), contains language that could, in isolation, be understood as suggesting that the beneficial inducements prohibited by ORS 136.425(1) and its predecessors are promises only of *prosecutorial* leniency. That oft-quoted passage reads as follows:

> "The precise form of words in which the inducement is presented to the prisoner's mind is immaterial. It is sufficient if they convey to him the idea of *temporal* benefit or

---

[4] ORS 136.425(1) provides:

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats."

disadvantage, and his confession follows in consequence of the hopes thereby excited."

9 Or at 163 (emphasis added). Although the significance of the word "temporal" in that passage has never been expressly considered in the case law, one plausible understanding of the court's reference to a "temporal benefit" in *Wintzingerode* might be that it intended to prohibit only the inducement of confessions through promises of shorter sentences or, in cases involving offers of immunity, prosecutorial promises of no sentence at all. *See Webster's Third New Int'l Dictionary* 2353 (unabridged ed 2002) (defining "temporal," in relevant part, as "of or relating to time"). And, if that were the case, that passage in *Wintzingerode* might support the trial court's apparent understanding that, to be an unlawful inducement, a promise of "leniency" must be a promise made in regard to prosecutorial leniency, since the length of a person's sentence is, at least initially, a matter of prosecutorial discretion. However, the case law does not support that understanding of either *Wintzingerode* or ORS 136.425(1).[5]

As the Supreme Court has explained, "the purpose of the common-law rule and the statute that now embodies it," *i.e.*, ORS 136.425(1), "is to exclude potentially false—and thus unreliable—confessions from evidence." *State v. Powell*, 352 Or 210, 222, 282 P3d 845 (2012) (upholding trial court's exclusion, under ORS 136.425(1), of confession induced by private FedEx investigators); *see also State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986) (stating that "the key to the 'free and voluntary' character of the confession is the inducement made to the defendant—was there any promise or threat made to the defendant [that] would elicit a false confession"). To that end, the Supreme Court has described the relevant inquiry as follows:

"As our cases consistently have recognized, confessions are unreliable when rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless

[5] Because we ultimately conclude that the provisions of ORS 136.425(1) are sufficient to require exclusion of defendant's confession and reversal of his conviction, it is not necessary to separately discuss whether the application of Article I, section 12, would lead to the same outcome.

of the truth or falsity of the confession. Whether the person offering the benefit or threatening the detriment or the person to whom the confession is made are state actors or private persons is not, in itself, determinative of the reliability of the confession."

*Powell*, 352 Or at 222. The Supreme Court's recognition that benefits offered by private actors can undermine the reliability of confessions leaves little room to argue that the only legally significant promises under ORS 136.425 are those related to how a person will be prosecuted, because private parties do not control prosecutions. *See id.* at 224 (noting that "the FedEx investigators were private parties and, as such, did not have actual authority to decide whether the state would bring criminal charges"). Moreover, what little room the *Powell* decision might otherwise have left for such an argument was immediately foreclosed when the court went on to explain that "the FedEx investigators also held out *other compelling benefits unrelated to* [*the*] *defendant's criminal prosecution,* over which they did have control[.]" *Id.* at 225 (emphasis added).

The *Powell* court specifically identified two of those compelling benefits, both of which would have flowed from the FedEx investigators' promise to the defendant that, if he "cooperated with their investigation, 'nobody but who's in this room needs to know' about the thefts." *Id.* (internal brackets omitted). First, by implying that the defendant's supervisor would not be told of his thefts, the investigators suggested that the defendant would not lose his job if he confessed. *Id.* Second, the investigators' statement also suggested that the defendant's wife would not learn of his alleged involvement in those crimes. *Id.* As the court concluded, "[t]hose were compelling benefits when offered in exchange for [the] defendant's confession, especially when coupled with the additional assurance that a confession would not result in criminal prosecution." *Id.*

Those promises—which the Supreme Court expressly noted were *not* related to the defendant's prosecution—were significant to the court's conclusion in *Powell* that the state had not met its burden of proving that the defendant's confession had been voluntary. That holding belies any belief that, in assessing whether a suspect's confession is the

unlawful product of threats or promises, the only potentially significant promises are those related to prosecution.

We turn to whether defendant was unlawfully induced to confess here. As the trial court expressly found in this case, not only did Schmidt promise defendant that he would not take him to jail if he confessed, but, additionally, "defendant \*\*\* proceeded to confess when presented with those options"; stated differently, defendant's confession was the product of Schmidt's promise that he would not arrest him if he told Schmidt what he wanted to hear.

We conclude that, whether Schmidt's statements are better understood as threats or as cognizable promises of leniency under ORS 136.425(1), those inducements were, at least collectively, sufficiently compelling to elicit a false confession. Once again, this is the applicable test from *Powell*:

> "As our cases consistently have recognized, confessions are unreliable when rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession."

352 Or at 222. Here, because defendant was facing relatively minor charges, Schmidt's promise to only cite him—as well as to help him avoid losing his prized Honda—could well have induced a false confession, especially given that the charges were not serious enough that a jail sentence would inevitably result from the confession itself. Moreover, as in *Powell*, until Schmidt extended a promise of liberty to defendant, he had "staunchly denied any knowledge of or involvement" in the driving offenses that Schmidt was investigating. *Id*. at 225. At a minimum, the burden was therefore on the state to establish that that promise was insufficiently compelling as a matter of law, which it did not do. *See id*. As a result, we conclude that the trial court erred in not excluding defendant's confession.

In reaching that conclusion, we recognize that the trial court considered itself bound—as the state argued at the suppression hearing and argues anew on appeal—by our decision in *Landers*, which the trial court understood as

holding that an officer's threat to do something that the officer can lawfully do is not a cognizable "threat" under ORS 136.425(1). And, because defendant did not dispute that, at the time of his confession, Schmidt had probable cause to arrest him for the offense of attempting to elude a police officer, the court concluded that Schmidt's threat to arrest him if he refused to confess was a threat that Schmidt lawfully could carry out. Thus, the trial court reasoned, that was not an unlawful threat for purposes of ORS 136.425(1).

Defendant offers three reasons why, in his view, the trial court's reliance on *Landers* was misplaced. That case, defendant argues, (1) is inapposite, (2) purports without explanation to rely on cases that themselves lack substantial analysis, and (3) is rooted in Oregon Supreme Court case law that is *not* directed at the issue of coerced confessions under Oregon law but, instead, relates to consent searches under the Fourth Amendment to the United States Constitution. We agree with defendant that, for each of those reasons, the trial court's reliance on that case was at least somewhat questionable. Moreover, the rationale of *Landers* cannot be squared with our more recent decisions or those of the Supreme Court. Thus, even though *Landers* has never expressly been overruled and defendant does not contend otherwise or advocate that we overrule it now, we conclude for the reasons that follow that our decision in that case cannot be viewed as controlling here.

We begin with defendant's overarching contention that *Landers* simply does not apply here. Although we do so for reasons somewhat different than those that defendant advances, we agree that *Landers* is generally inapplicable. In that case, a state trooper, Codding, questioned the defendant at his home about evidence suggesting that the defendant was manufacturing marijuana at another location. *Landers*, 101 Or App at 295-96. The defendant initially expressed reluctance to speak with Codding about the investigation. *Id.* at 296. At the suppression hearing, Codding testified that, after "there was a 'lagging in the conversation,'" he had told the defendant "that he had sufficient information to warrant an indictment for manufacturing marijuana and that he could either take [the] defendant into custody or issue him a citation to appear in court at a later time." *Id.*

The defendant then confessed to unlawfully growing marijuana. *Id.*

Although the defendant in *Landers* testified that, after apparently disregarding his request for an attorney, "Codding [had] told him that he could either arrest him on the felony charge or, if [the] defendant cooperated and gave a statement, he could simply issue a citation,"[6] the trial court *rejected* that testimony. *Id.* at 297. Rather than rely on the defendant's account, the court expressly "adopt[ed] Trooper Codding's version of *what* was said and *when* it was said in the course of his conversation with [the defendant]." *Id.* (emphasis in original; bracketed material added). Thus, the trial court specifically rejected the defendant's testimony that Codding had conditioned the defendant's freedom on his willingness to cooperate by making a statement.

The trial court's finding in *Landers* suggests to us two conclusions. First, our statement in that case—that the "defendant's confession was not coerced by Codding's statement that he could either arrest [the] defendant or simply issue him a citation[,] because * * * there was probable cause to arrest [the] defendant[, and] Codding, therefore, did not threaten to take any action that was not authorized under the facts"—appears to be *dictum. Id.* at 297-98. That is, since the trial court had expressly rejected the defendant's testimony that Codding had given him an ultimatum that led to his confession, we had no reason to decide whether such an ultimatum would constitute unlawful coercion under ORS 136.425(1) or Article I, section 12. For that reason alone, *Landers* is not controlling here. *See Halperin v. Pitts*, 352 Or 482, 492, 287 P3d 1069 (2012) (explaining that the term *dictum* "commonly refers to a statement that is not necessary to [a previous] decision" and that, therefore, has no precedential effect).

Second, and relatedly, *Landers* is factually distinguishable. In that case, Trooper Codding merely told the

---

[6] The defendant also testified that Codding had said that the charge would likely be reduced to a misdemeanor if he cooperated, but, on appeal, we concluded that the trial court had found that Codding had made that statement *after* the defendant confessed; accordingly, that statement could not have coerced his confession. *Id.* at 297-98.

defendant that there were two avenues Codding could take: He could "either take [the] defendant into custody or issue him a citation to appear in court at a later time." *Landers*, 101 Or App at 296. Codding did not condition that choice on whether the defendant cooperated, and the trial court rejected the defendant's testimony that Codding had imposed such an ultimatum. *Id*. at 296-97. Here, in sharp contrast, Schmidt expressly told defendant that he would go to jail if he continued to maintain his innocence, and the trial court found that defendant's confession resulted from that threat. As a result, defendant in this case faced a threat that the defendant in *Landers* did not face, whether or not it was a threat that Schmidt had the lawful authority to carry out. Accordingly, as defendant argues, *Landers* is inapposite.

As defendant also argues, our observation in *Landers,* that a threat to do what is lawfully permitted does not constitute coercion, appears to rest on shaky ground. For that proposition, we cited *State v. Bates*, 92 Or App 385, 388, 758 P2d 421, *rev den*, 307 Or 170 (1988), but we did not discuss *Bates* or our rationale in that case. *Bates*, in turn, is even more sparse in its analysis, and it cites no particular authority for its conclusion. In that case, the defendant contended that his custodial statements were involuntary because he had admitted to a burglary after an officer "told him that he would have to question his mother and brother if the incident was not resolved." 92 Or App at 387. *Bates* does not identify what authority the defendant relied on, nor does the opinion cite, much less analyze, the statutory or constitutional bases for its own conclusions. Rather, after assuming that the trial court had rejected the defendant's testimony that an officer had threatened to arrest—as opposed to merely question—his relatives, the opinion summarily concludes:

> "We presume, therefore, that the officer threatened to question defendant's relatives about the burglary, which he had a right to do. His 'threat' did not constitute coercion and does not render defendant's subsequent statements involuntary. *See State v. Medenbach*, 48 Or App 133, 138, 616 P2d 543 (1980)."

*Id*.

Seeking to understand the significance of that otherwise unadorned statement in *Bates*, we turn to the single case it cites, *Medenbach*, but that opinion is similarly unhelpful. That is, *Medenbach* sheds little or no light on the meaning of *Bates,* because, in its only conceivably relevant part, *Medenbach* (1) purports to be a *Miranda* case and addresses neither ORS 136.425(1) nor Article I, section 12; (2) appears to be more of a consent-to-search case than a coerced-confession case, because the "threat" in that case was that the defendant had been told that he would be arrested if he did not agree to take some field sobriety tests;[7] and (3) cites, as the basis for its conclusion that an officer's threat to do something that is lawfully permissible cannot give rise to "constitutionally objectionable" coercion, a *dissenting* opinion in *State v. Douglas*, 260 Or 60, 81, 488 P2d 1366 (1971), *cert den*, 406 US 974 (1972), which is itself a consent-to-search case based in the Fourth Amendment.[8]

Thus, as defendant points out, even if *Landers* would otherwise be controlling in this case, its lack of explanation—as well as a similar lack of explanation in the decision it cites as authority—raises serious questions as to what law it states and whether it correctly states that law. One might reasonably distinguish between a threat, for example, to obtain a warrant in a consent-to-search situation from a threat to penalize (by arrest or otherwise) a person who wishes to exercise his or her constitutional right against self-incrimination. In the former situation, procuring a warrant is not a punishment for the refusal to consent, nor does it produce evidence, like a confession, that the state would otherwise not obtain; it is merely an alternative

---

[7] As a general matter, a field sobriety test is a "search." *See, e.g.*, *State v. Nagel*, 320 Or 24, 31, 36, 880 P2d 451 (1994).

[8] For two thoughtful views on that history, one might consider Justice Linde's succinct dissenting opinion in *State v. Bates*, 307 Or 170, 764 P2d 550 (1988) (Linde, J., dissenting) (discussing that history and the "dubious proposition" apparently endorsed in Court of Appeals' *Bates* and *Medenbach* decisions), and Justice Kistler's more expansive discussion of *Douglas* and its Supreme Court progeny in *State v. Moore*, 354 Or 493, 510, 318 P3d 1133, *adh'd to as modified on recons*, 354 Or 835, 322 P3d 486 (2014) (Kistler J., concurring). Both opinions can be read as cautioning against the undiscerning reliance on snippets from earlier case law that arguably characterizes our decisions in cases such as *Medenbach*, *Bates*, and *Landers*.

way of accessing the same, lawfully obtainable evidence. As a result, explaining to a suspect that a warrant will be sought if the suspect refuses to give consent does not give an officer access to evidence that he or she would not ultimately obtain even if the suspect refused to waive any constitutional rights. A coerced confession, on the other hand, by definition, compels self-incrimination and therefore discloses to the state evidence that it would otherwise be unable to obtain—a person's confession—unless the person gave up the absolute right *not* to confess. If there is a reason that a confession coerced through lawful threats does not contravene the protections of ORS 136.425(1) and Article I, section 12, it cannot be found in *Landers* or the line of cases on which that decision apparently relies.

Ultimately, however, it is not necessary to conclusively decide whether our decision in *Landers*—or, for that matter, in *Bates* or *Medenbach*—stated, at the time of their issuance, a binding holding that an officer's threat to take some action that the officer has lawful authority to take does not constitute unlawful inducement under ORS 136.425(1) and Article I, section 12. We need not decide that question because, even if that was the state of the law at the time we issued *Landers* (the most recent of those three opinions), it cannot be reconciled with decisions that we and the Supreme Court have issued since that time, as we will explain.

The Supreme Court's analysis in *Jackson* illustrates the conflict between the *per se* rule articulated in *Landers* and the more nuanced approach dictated under ORS 136.425(1). In *Jackson*, 364 Or at 3-4, DNA evidence led to the defendant becoming a suspect in the murder of four women whose bodies had been found 30 to 40 years earlier. Following extensive questioning over the course of a morning, the defendant finally confessed to having killed one of the victims; after further questioning that same afternoon and the next morning, the defendant acknowledged that he "may have done" another of the murders. *Id*. at 5-16. After the trial court granted the defendant's motion to suppress those statements as involuntary under ORS 136.425(1), the state pursued an interlocutory appeal in the Supreme Court. *Id*. at 17.

On appeal, the Supreme Court identified the relevant inquiry as "whether the state [had] met its burden to prove that [the] defendant's free will was not overborne and his capacity for self-determination was critically impaired and that he made his statements without inducement from fear or promises." *Id*. at 22. The court further explained that the underlying issues were interrelated and that it was required to consider "the totality of the circumstances in reaching a legal conclusion about the voluntariness of defendant's statements." *Id*. at 23. After agreeing with the state that two of the "basic themes" of the interrogation were not "the sort of themes that have concerned [the] court in the past," the court turned to the interrogating detectives' third theme—the "legal ramifications of [the] defendant's failure to confess." *Id*. at 25.

Of particular relevance here are at least two of the threatened "legal ramifications": (1) unless the defendant told the detectives when he stopped killing women, they would view him as a suspect in additional murders; and (2) if he did not confess but was nonetheless convicted, they "would do everything they could to ensure that he received a harsh sentence." *Id*. Relying, in part, on its earlier decision in *State v. Linn*, 179 Or 499, 173 P2d 305 (1946), the court considered those threats significant. Specifically, as in *Linn*, where an officer had told the defendant that if he did not confess "the police would fight him to the last inch," *Jackson*, 364 Or at 27 (internal quotation marks omitted), the detectives in *Jackson* told the defendant that they "would do their best to ensure that he received the maximum possible sentence." *Id*.

Although there would seem to be no question that the detectives in *Jackson* could lawfully have continued to investigate whether the defendant was involved in other murders or do what they could to ensure that the defendant received a lengthy sentence if he were to be convicted, the Supreme Court did not discount the potentially coercive nature of those threats. Rather, it considered whether, under the totality of the circumstances, those threats constituted "impermissible inducement[s]," *i.e.*, "one[s] that convey[] to a defendant the idea of a threat or promise." *Id*. at 24 (discussing principles gleaned from *Wintzingerode* and *Linn*).

Thus, the operative question under ORS 136.425(1) is—and, in light of the Supreme Court's reliance on the case law predecessors to the statute, has apparently long been—whether a person's confession is the unlawful product of threats, *not* whether the threats themselves are lawful or unlawful.

Our own case law reflects the same principle. For example, in *Belle*, 281 Or App at 210-11, the defendant was suspected of allowing his cousin to use his bank account to facilitate fraudulent check-related thefts. In the course of questioning the defendant, a detective determined that he was in the National Guard. *Id.* at 211. Evidently sensing a potential vulnerability, the detective first asked the defendant whether he was familiar with the military code of conduct (he was), and then told the defendant that the matter could "be handled on the state level and not under the military code"; the detective further emphasized that he had not yet spoken with the defendant's commanding officer. *Id.*

Following a suppression hearing, the trial court found that the detective's "statements were 'compelling,' 'significant,' and an inducement that prompted [the] defendant to confess." *Id.* at 215. Nonetheless, the trial court concluded that the defendant's confession was voluntary and admissible. *Id.* We disagreed. As we explained, "once the trial court found as fact that [the] defendant's confession was induced by [the detective's] statements, then it necessarily follow[ed] as a matter of law that the confession could not be admitted under ORS 136.425." *Id.* Of particular significance here, we observed that "[i]t does not matter *whether the person making the threat actually has the ability or authority* to carry it out, as long as the defendant reasonably perceives the threat to be real." *Id.* at 213 (discussing *Powell*; emphasis added).

For two reasons, the trial court's reliance on *Landers* cannot be reconciled with *Belle*. First, as in *Jackson*, there is no reason to believe that the detective's implicit threat[9]

_____

[9] Our decision in *Belle*—as in most cases addressing ORS 136.425(1)—does not categorically distinguish between "threats" and "promises" of leniency. Rather, it appears to recognize that there is often no meaningful distinction between the two, as a threat to take some adverse action if a suspect refuses to confess can often be viewed as a promise not to take the same adverse action if the suspect does confess.

in *Belle*—to involve the defendant's military commander—was something that the detective could not lawfully do. Nonetheless, we held that the threat to take that action constituted coercion. *Id*. at 215. Thus, contradicting the *dictum* found in *Landers*, the *holding* of *Belle* appears to be that an officer's threat to take a lawful course of action *does* constitute impermissible inducement under ORS 136.425(1), at least if the state does not satisfy its burden of proving that a defendant's will was not overborne by that inducement.

Second, even if the detective in *Belle* did *not* have the authority to report the defendant's conduct to his commanding officer, that case would remain irreconcilable with *Landers*. Even without its explicit statement that, for purposes of voluntariness, an officer's actual authority—or lack of authority—to carry out a threat is irrelevant, *Belle* cannot reasonably be understood to permit officers to induce confessions so long as they do so by means of threats that they can lawfully make good on. For one thing, such a rule would legitimize compelled self-incrimination, which almost certainly would contravene an individual's constitutional rights, regardless of whether it also violated ORS 136.425(1). For another, it would defy logic to suggest that an idle threat may be sufficient to violate the statute, but a threat that has the potential to actually be carried out cannot. Cases like *Powell* and *Belle* avoid such an incongruous result by recognizing that what matters is *not* whether the threat is real, but whether "the defendant reasonably perceives the threat to be real." *Belle*, 281 Or App at 213 (discussing *Powell*).[10]

In this case, the trial court implicitly found that the prospect of being arrested prompted defendant to confess, and the state does not contend otherwise. Under *Belle*, there arguably is nothing left to decide. *See Belle*, 281 Or App at 215 ("Once the trial court found as fact that [the] defendant's confession was induced by [the detective's] statements, then

---

[10] Not to unduly belabor the point, but the consequence of making the existence of actual authority to carry out a threat dispositive under ORS 136.425(1) is that, if a suspect reasonably believed a threat to be real but was *mistaken*, then he or she may have been impermissibly induced to confess, but if the suspect's reasonable belief that the officer could actually carry out the threat was *correct*, then the suspect has no recourse under the statute and the induced confession is admissible.

it necessarily follow[ed] as a matter of law that the confession could not be admitted under ORS 136.425.").  However, whether or not Schmidt's threat of arresting defendant rendered his confession involuntary as a matter of law, the state does not argue that, if that threat is appropriately considered as part of the totality of the circumstances, the state has nonetheless satisfied its burden of proving that defendant's confession was voluntary.  We conclude that defendant's confession, following as it did upon Schmidt giving defendant an ultimatum—effectively, "confess or you will go to jail and may well find yourself unable to recover your most prized (or only) belonging"—was induced by Schmidt's threats and promises and that the state has not shown that it was nonetheless voluntary.  We therefore conclude that the trial court erred in concluding otherwise.

We further conclude that the trial court's error was not harmless.  The state does not contend that any such error would have been harmless, and we agree with defendant that, notwithstanding Riviere's testimony identifying him as the driver, the erroneous admission of his confession impaired his ability to challenge that identification and was otherwise harmful to his defense.[11]  Accordingly, we reverse and remand for a new trial.

Reversed and remanded.

**MOONEY, J.,** dissenting.

The trial court did not err when it denied defendant's motion to suppress his admission to being the driver of the pursued vehicle.  The majority disagrees and concludes that defendant's confession was induced by the investigating officer's "ultimatum" that defendant either level with him or spend the night in jail and jump through the hoops necessary to retrieve his impounded car upon release from jail.  In reaching that conclusion, the majority walks through a detailed discussion of the prohibition against compelled

---

[11] As noted, we do not address the merits of defendant's argument that the trial court erroneously admitted evidence identifying him as the driver of the fleeing vehicle. 314 Or App at 815 n 1. However, for purposes of determining whether the erroneous admission of defendant's confession was harmful, we consider that evidence in light of the trial that occurred, which included the admission of the eyewitness testimony.

self-incrimination, specifically focused on unlawful induce-ments. It surveys cases ranging in publication date from 1881 to the present day, reminding the bench and bar how to distinguish between *dictum* and precedential holdings. The majority highlights just how those cases fall short due to "sparse" analysis, "somewhat questionable" reliance on other cases, and the use of "unadorned" statements within the opinions themselves. In the end, there can be no doubt that the law on this important legal topic is complex and that the proper application of that law to any particular case is fact-driven. But the fact that the law is complex, or even that a decision addressing a complex area of the law may be impressively written, does not make that decision right. I write separately because, when the law is properly applied to the facts of this case, it is clear that the trial court correctly denied defendant's motion to suppress. I would affirm.

Officer Schmidt provided defendant with accurate information when he told him that he thought he had proba-ble cause to arrest defendant and that, if he did arrest him, defendant's car could be impounded. Schmidt explained that the next step in his investigation would either be (1) to issue defendant a citation requiring him to appear in court at a later date or (2) to arrest defendant and immediately take him into custody. If Schmidt chose the first option, defendant would be allowed to leave the interview in his car. If Schmidt chose the second option, defendant would be taken into custody and booked into the local jail. The second option included the possibility that defendant would spend a night or two in jail (it was the weekend) and impoundment of his car. Whether defendant's cousin who was present at the police station would have been permitted to take defen-dant's car home does not appear to have been discussed.

If, at that point in the conversation, Schmidt had simply told defendant which option he had decided to use, we would not be addressing the question of whether Schmidt had induced an admission from defendant through the use of a threat or promise in violation of Article I, section 12, of the Oregon Constitution. That is because there is nothing wrong with an officer advising a suspect about his investiga-tion or what the officer's next steps will be. One might even

say that an officer providing accurate information about the status of his or her investigation to the person who is the subject of that investigation is a good idea. So far as I am aware, and assuming the suspect has not invoked his right to have counsel present, there is also nothing wrong with an officer simply asking a suspect what happened or what his involvement might have been.

I agree, however, that, when the officer asks a suspect what happened after explaining to him the different outcomes he could expect depending upon which answer he gives, we must evaluate whether the question thus posed overbore the suspect's capacity for self-determination, inducing an admission or confession regardless of its truth. In other words, we ask whether the officer tied one potential answer to a threat so undesirable or a promise so desirable that the suspect's choice to give a different answer, as a practical matter, became very difficult—predictably yielding an admission or confession *even if the admission or confession is not true*. Such admissions and confessions are inherently unreliable, and we do not allow a party to use such statements as evidence against the defendant.

Turning to the facts of this case, I agree that, when Schmidt asked defendant to "level with [him]" and to "tell the truth," he was encouraging defendant to speak with him. To be sure, his question was not hypothetical—he expected an answer. Schmidt was attempting to engage defendant in a conversation about the crimes that he was investigating. I also agree that, because Schmidt first spelled out the consequences that would follow if defendant were to admit—or not admit—that he was the eluding driver, Schmidt's question amounted to an inducement requiring us to assess whether the law prohibited that particular question as coercive.

Defendant points to two of Schmidt's statements as unconstitutionally coercive. First, he argues that Schmidt's presentation of an opportunity to receive a citation instead of a weekend in jail if he "told the truth" was both a threat and a promise of leniency. Second, he argues that Schmidt preyed upon his specific vulnerabilities when he promised to return defendant's car if he "told the truth" rather than having it impounded.

Properly framed, our task is to determine whether the state demonstrated that defendant's admissions were voluntary—"the product of [his] free will." *State v. Vasquez-Santiago*, 301 Or App 90, 107, 456 P3d 270 (2019). "The test for voluntariness is whether, under the totality of the circumstances, the confession is the product of an essentially free, unconstrained, and informed choice, or whether a person's capacity for self-determination is critically impaired." *State v. Hogeland*, 285 Or App 108, 114, 395 P3d 960 (2017) (citing *State v. Ruiz-Piza*, 262 Or App 563, 573, 325 P3d 802 (2014)).

First, Schmidt's offer to cite defendant rather than arrest him if he "told the truth" is not a cognizable "promise of leniency," as we have defined that term. Schmidt did not promise defendant immunity from criminal liability in exchange for an admission or confession. And he did not threaten defendant with harsh or increased penalties if he chose not to confess. In other words, defendant's admission was not "obtained by an express or implied promise of immunity or leniency" and, therefore, was not "involuntary as a matter of law[.]" *State v. Pollard*, 132 Or App 538, 543, 888 P2d 1054, *rev den*, 321 Or 138 (1995); *see also State v. Ely*, 237 Or 329, 334, 390 P2d 348 (1964); *Hogeland*, 285 Or App at 114; *State v. Goree*, 151 Or App 621, 631, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998); *State v. Aguilar*, 133 Or App 304, 309, 891 P2d 668 (1997) ("It is assumed that when a person confesses in response to a promise that the person will not be charged with the crime for which the confession is made, the person's confession is not the product of an essentially free and unconstrained choice."). The Supreme Court and this court have consistently held that promises of immunity or leniency refer to a promise that the suspect will receive preferable prosecutorial treatment. *See Hogeland*, 285 Or App at 115 (suppressing a confession when the officer implied that, by confessing, the defendant would receive "treatment" rather than "punishment"); *State v. Powell*, 352 Or 210, 223-24, 430 P3d 845 (2012) (suppressing a confession when the investigator's statements implied that the defendant could avoid prosecution by confessing); *Pollard*, 132 Or App at 546 (suppressing a confession when the officer offered to "help" the defendant if he told the truth and that

he would "take [the case] to a grand jury" if he did not tell the truth); *State v. Capwell*, 64 Or App 710, 717, 669 P2d 808 (1983) (suppressing the defendant's confession where, based on the interviewing officer's statements, the "[d]efendant's inference that his confession would assure him of treatment rather than eventual incarceration was reasonable under the circumstances"). I do not question the trial court's finding that defendant's inculpatory statements were prompted by Schmidt's offer to cite him in lieu of arresting him, but that "offer" was not a promise of immunity or leniency because it would not affect how—or whether—defendant would be charged or prosecuted. I disagree with the majority's conclusion to the contrary. 314 Or App at 823.

The majority conflates a "promise of leniency" with other types of inducements and, in so doing, bootstraps the *per se* exclusionary rule, which has been specially carved out for promises of prosecutorial leniency. This is not a *per se* case because Schmidt did not offer defendant leniency. The majority essentially ignores *Aguilar*, *Hogeland*, *Goree*, and *Ely*, all of which involved promises of prosecutorial leniency and all of which held that such promises are unconstitutional inducements *as a matter of law*. Instead, the majority questions—but does not claim to disturb—that existing case law and extends the *per se* exclusionary rule to this case even though this case does not involve a promise of prosecutorial leniency. The majority mentions *Wintzingerode* and—somewhat grudgingly—acknowledges that it "could, in isolation, be understood" to say that the exclusionary rule applies only to promises of prosecutorial leniency. 314 Or App at 821 (quoting *State v. Wintzingerode*, 9 Or 153, 163 (1881)). It then focuses on the word "temporal" as it was used in that 140-year-old case, rather than on the word "leniency," as we have used that term in the decades since *Wintzingerode* was published. "Leniency" means "the quality or state of being lenient," which, in turn, means "of mild or tolerant disposition or effect: not harsh, severe, or strict." *Webster's Third New Int'l Dictionary* 1293 (unabridged ed 2002). The majority also ignores specific passages from *Aguilar* and *Goree*, which emphasize that promises of immunity or leniency *on specific charges* invalidate the subsequent confession only as to *those charges*. *See Goree*, 151 Or App at 631

("[T]he invalidating effect of a promise of immunity or leniency *as a matter of law* applies only to the charge with respect to which the promise was given." (Emphasis in original.)); *Aguilar*, 133 Or App at 309. We would not have focused so pointedly on charging decisions in those cases if the term "promise of leniency" did not, in fact, refer to such charging decisions.

In this context, we have consistently used the phrase "promise of leniency" to mean promise of *prosecutorial* leniency. I would conclude that the *per se* exclusionary rule applies to promises of some sort of "disposition or effect" that the officer has no power to provide—that is, prosecutorial leniency—not the "leniency" associated with an offer of an immediate benefit that is within the officer's power to provide and that has nothing to do with what charges may or may not be brought by the prosecutor's office. I would reject defendant's argument that Schmidt's offer was one of leniency.

Because Schmidt's offer was not a promise of leniency, the question is thus whether, under the totality of the circumstances, Schmidt's inducements "overbore" defendant's will.[12] The trial court relied on *State v. Landers*, 101 Or App 293, 790 P2d 1161 (1990), to conclude that Schmidt's inducement was not sufficiently coercive. In *Landers*, a police officer had probable cause to arrest the defendant and presented him with a choice: He could take him into custody or issue a citation to appear in court at a later time. *Id.* at 296. The defendant then confessed and was cited. *Id.* The trial court denied the defendant's motion to suppress his confession, and he was convicted. *Id.* He appealed his conviction, arguing, among other things, that his confession was the product of a coercive threat to arrest him in lieu of a citation. *Id.* at 297. We affirmed the trial court's denial of the defendant's motion to suppress, concluding that his confession was voluntary because the officer did not threaten to do anything unauthorized by the facts, and because a reasonable person would not have been induced to incriminate him or herself under those circumstances. *Id.* at 297-98 (citing

---

[12] On this point, I agree with the majority; our inquiry is much broader than simply looking to whether Schmidt's offer was a promise of leniency.

*State v. Bates*, 92 Or App 385, 388, 758 P2d 421, *rev den*, 307 Or 170 (1988)). *Cf. State v. Moore*, 354 Or 493, 502, 318 P3d 1133 (2013), *adh'd to as modified on recons*, 354 Or 835, 322 P3d 486 (2014) (holding, in the context of searches under Article I, section 9, of the Oregon Constitution that, when "'officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable'" (quoting *State v. Hirsch*, 267 Or 613, 622, 518 P2d 649 (1974))); *State v. Douglas*, 260 Or 60, 79, 488 P2d 1366 (1971), *cert den*, 406 US 974 (1972) (holding same).

Defendant acknowledges that, in *Landers*, we held that inculpatory statements that are the product of an officer's threat to take legal action are not necessarily involuntary. *Landers*, 101 Or App at 297. He argues that *Landers* is inapposite because it was based on case law that predates our voluntariness analysis under both Article I, section 12, and ORS 136.425. The majority says that the trial court's reliance on *Landers* was "somewhat questionable." It notes that *Landers* has not been overruled and it mentions that we are not asked to overrule it now.

*Landers*, in fact, has not been overruled and we have not held that a threat to take lawful action, by itself, necessarily renders an admission involuntary. *See, e.g., Ruiz-Piza*, 262 Or App at 574 (citing *State v. Hovater*, 42 Or App 13, 16, 599 P2d 1222 (1979), for the proposition that "accurately informing a defendant of the consequences of his refusal to cooperate is permissible" even when those consequences include "being separated from his children"). *Cf. Moore*, 354 Or at 511 (Kistler, J., concurring) (rejecting the possibility that "reminding a suspect of the adverse consequences that will flow from whatever decision he or she makes will automatically render the resulting choice involuntary"). I reject the majority's scuttling of *Landers* and its rendering as superfluous much of our case law that describes the role that the totality of the circumstances approach plays in the voluntariness analysis for inducements other than promises of leniency.

I cannot join the majority in its reliance upon *State v. Belle*, 281 Or App 208, 213, 383 P3d 327 (2016), as the

power-assist the majority needs to leap from the causal link between Schmidt's question and defendant's answer to the conclusion that the answer was improperly coerced. The majority ignores the importance of assessing the question and answer in the context of the totality of the circumstances when it concludes that there is "nothing left to decide" if a defendant's statements were induced by an officer's question. We repeatedly focus on the nature, extent, and severity of an officer's threat, promise, or other inducement in our cases precisely because exclusion requires more than just a causal link. There are countless examples of inducements that lead directly to confessions that nevertheless do not overpower a defendant's free will.

I have no trouble imagining a scenario where a promise to take legal action could be sufficiently coercive to render a person's statements involuntary and, therefore, inadmissible. But I would not limit an officer's ability to investigate a crime by prohibiting altogether the use of promises to take lawful action. The question of voluntariness—when the threat or promise is not one of prosecutorial leniency—must fundamentally be answered utilizing a totality of the circumstances inquiry. Our inquiry is subjective. *State v. Pryor*, 309 Or App 12, 21-22, 381 P3d 340 (2021).

During Schmidt's investigation, defendant explained that he had "been here before" and "done this before," in reference to his experience with the criminal justice system and his incarcerative history. In other words, he understood the potential consequences of speaking with the police, and he communicated that to Schmidt after being advised of his *Miranda* rights. Given that the relevant inquiry is whether defendant's "capacity for self-determination was *** critically impaired," *State v. Rodriguez-Moreno*, 273 Or App 627, 639, 359 P3d 532 (2015), defendant's experience with police encounters provided some context for understanding the conversation between Schmidt and defendant that is otherwise lacking in the majority's analysis.

Turning to the two statements at issue, I would conclude that, notwithstanding Schmidt's inducements, the state met its burden to establish that defendant's statements

to Schmidt were voluntarily made. First, defendant told Schmidt his version of events after Schmidt explained that he had probable cause to arrest him based upon an eyewitness who identified him as the driver who left the parked car. Essentially, Schmidt told defendant that he could arrest him or cite him, regardless of whether—or what—defendant said to Schmidt at that time. As previously explained, he did not threaten or make any promises about potential prosecutorial decisions; he only threatened to take actions that were within his lawful authority to take after he explained that to defendant. Combined with the fact that defendant had experience interacting with the police, those facts are not sufficient, in my view, to support an inference that defendant's will was "overborne" or that "his capacity for self-determination was *** critically impaired" by Schmidt's offer to cite, rather than arrest, him. *Rodriguez-Moreno*, 273 Or App at 639.

We have repeatedly made clear that "coercive" techniques and even *lying* are not unconstitutionally coercive by themselves. *See Pryor*, 309 Or App at 22 ("[T]he detective's false representation does not point to the conclusion that the defendant's will was overborne."); *State v. Chavez-Meza*, 301 Or App 373, 389-90, 456 P3d 322 (2019) (concluding that the defendant's confession was voluntary even after incorrectly advising the defendant that charged crimes could be less serious if he believed that a victim of sexual abuse was 18). Schmidt's inducements could fairly be construed as "coercive," but not unconstitutionally so. He never lied to defendant; he never promised prosecutorial immunity; he offered to work with defendant to avoid taking him into custody—which he was entitled to do. Schmidt did not subject defendant to bright lights or prolonged isolation or questioning, and he did not deprive defendant of food and water in order to elicit a confession. And, of course, even "the fact that an interrogation is physically and mentally demanding does not necessarily make the admissions that are adduced involuntary and inadmissible." *See State v. Jackson*, 364 Or 1, 31, 430 P3d 1067 (2018).

Second, Schmidt stated that he wanted to "figure out a way to get [defendant's] car out so it doesn't get lost and a lien placed on it to the point where you can't get it

out[.]" It is true that preying upon a defendant's acute vulnerabilities can render a subsequent confession involuntary. *See Vasquez-Santiago*, 301 Or App at 117-18 (preying upon a father's concern for his child's safety); *Ruiz-Piza*, 262 Or App at 574 (finding that a confession was involuntary when, combined with another factor, the police "suggested—if not outright stated"—that the defendant's child's "medical care would be dictated by what defendant told them"). Here, defendant agreed that he did not want to lose his car. But it was Schmidt who described defendant's car as "all [defendant] had" and it was Schmidt that referred to the car as defendant's "baby." No doubt, Schmidt chose those words to appeal to defendant's emotions, but the sequence of questions and answers quoted by the majority in its opinion reflects that Schmidt's invocation of defendant's car was more in the nature of pushing defendant's "buttons" than it was preying on an acute vulnerability such as defendant's love for a child or other family member. In my view, the promise to release the car to defendant if he told the truth was not one that would have overpowered defendant's will and induced him to falsely incriminate himself given the record before us.

Unlike most of our cases focusing on this particular inquiry, the object of defendant's vulnerability was his car— not a person, *Vasquez-Santiago*, 301 Or App at 99 (the defendant's child), not his "sense of empathy or guilt," *Rodriguez-Moreno*, 273 Or App at 638 (combined with other factors), and not his religious convictions, *Ruiz-Piza*, 262 Or App at 574-75 (combined with invoking the defendant's child). And the particular type of action that would have been taken had defendant not confessed would have been, at worst, placing an officer's hold on the car before defendant could retrieve it. There is no evidence that defendant's car was his home; no evidence that it was his only transportation to work; no evidence that he needed the car that night for parenting time or some other family obligation; and no evidence that the car held emotional significance for him beyond the fact that he apparently took good care of it. In fact, there is no evidence to suggest that we should view defendant's "relationship" with his Honda similar to that of the relationship he might have with a child or spouse. The majority refers to the car as "prized," but that changes nothing. I would not

conclude, as the majority does, that there is something so special about defendant's car that the temporary inconvenience of impoundment would upend his capacity for self-determination and cause him to confess to a crime he did not commit. As we have explained,

> "[f]ew things are more powerful than the familial bonds that tie us together—especially the bonds of love and protection that a parent has for his or her child. When those bonds are used as a pressure point to induce a confession to a crime, there is a risk: Was the confession a product of free will, or the result of an inducement of hope or fear such as to render the confession unreliable?"

*Vasquez-Santiago*, 301 Or App at 92. Schmidt's use of defendant's Honda as a "pressure point" pales in comparison to using a familial bond as a "pressure point" and it seems to me that one must abandon common sense to conclude otherwise.

At stake was the possibility that defendant's Honda would be impounded and that he might spend a night or two in jail. Those potential consequences are in an altogether different league than those at issue in the cases already described where the stakes involved such things as threats by an officer that he would do his best to ensure the suspect received the harshest sentence possible, threats to call a suspect's commanding officer, threats to call a suspect's spouse, or telling a suspect that his confession was the key to securing the release of his family members, including an infant child—matters much more likely to overcome a defendant's free will and coerce him to give a false, inculpatory statement.

But that is not this case. Not even close.

I respectfully dissent.

Egan, C. J., and DeVore, J., join in this dissent.